Case No. 15-7082 at L. Rahel A. Demissie, Appellant v. Starbucks Corporate Office and Headquarters Ms. Jackson for the Appellant, Ms. Tice for the Appellee Ms. Jackson Good morning, may it please the Court. My name is Lauren Jackson, Student Counsel from Howard University School of Law, Civil Rights Clinic, as well as the Court-Appointed Amicus Curiae on behalf of Appellant Rahel Demissie. This case implicates a long-standing principle of contract law. Where there is no meeting of the minds, there is no contract. And for your Honor's attention, I have reserved three requests of permissions to reserve three minutes for rebuttal. This Court should reverse the District Court's decision because the District Court erred in ordering that there was an enforceable contract, an enforceable settlement agreement, where there was no clear evidence of a meeting of the minds as to the material terms. Your Honor, the key piece of evidence in this case is that in a Starbucks-owned admission on November 14, 2014, an email sent eight days after the November 6th settlement conference, their Starbucks counsel admits that there was no clarity as to whether or not the characterization of the settlement agreement would be issued entirely as civil rights damages or as back pay. Can we back up for a second to November 6th? Yes, Your Honor. At the settlement agreement, at the settlement conference, I'm trying to understand what was the state of the mind of the actors, the people in that room, at the moment that the handshake took place. Now, at the moment the handshake took place, had they discussed, had your client's counsel raised the issue of tax treatment at the moment the handshake took place? At the moment the handshake took place, Judge Griffith, there was no discussion on the record that a tax allocation took place. But we do have, at that moment, the magistrate judge's law clerk said, we have a deal, right? Yes, Your Honor. That was testified. And prior to that time, the nature of the negotiations were that the only issue that was really unresolved was the amount of the settlement, right? Prior to the November 6th settlement agreement, there was a discussion as to her workers' compensation claim as well as the nature of the settlement. And we also assert that the law clerk's statement that there was a deal did have a huge impact on whether or not both parties determined whether a settlement agreement was, in fact, occurred. Because at this moment of the handshake, Denise's counsel at the time merely interpreted that to be thank you to the opposing counsel for being flexible, not necessarily that there was a deal in place. Now, Starbucks' counsel at the time may have taken that to mean that there was a deal, but from our client's counsel's testimony that he didn't interpret that there was to be a deal. And again, the key issue in this case is that there was no meeting of the minds as to the characterization of the settlement agreement, and because the manner in which it would be characterized was indeed material to Denise's counsel. What's the dollar difference between treating it as damages versus treating it as back pay? What's the dollar difference for your client? Your Honor, under the district court's review, the amount in terms of settlement amount was not discussed for the district court to review as it was not in evidence. According to opposing counsel, the amount that would be issued as back wages would have a $73 amount. Again, because it was not in evidence for the district court to review in terms of amount, it was not in our evidence to review. Well, let's imagine we could look at it. $73 out of a $10,000 settlement, I mean, I would like to have $73. There are a lot of things I could do with $73, but I wouldn't exactly think that's a material term of the settlement. I'd dispute over $73. Yes, Judge Griffith. Well, looking at the totality of the circumstances, it was symbolic that this settlement amount be characterized as civil rights damages for Starbucks to acknowledge that it was indeed liable for the national origin claim that was present, as well as the viable right retaliation claim as stated by Ms. Denise's counsel during the time of negotiations. So to characterize any part of that as back wages would have been improper because that was not what Ms. Denise's counsel at the time stated was the spirit that her client wanted, that his client wanted. It was to be characterized entirely as civil rights damages for Starbucks to acknowledge their liability, considering that back wage liability was not even an issue as also admitted by Starbucks at that time. Now, an agreement exists where all material terms and the intentions of the parties to be bound are present. And going back to the original points in this, looking at Starbucks' counsel's email on November 14th and stating, and I quote, I was agreeing just to look into whether or not it would be 1099. I'm sorry if that wasn't clear, to which Denise's counsel at the time stated, we do have a very viable retaliation claim that carries damages that have nothing to do with back pay. This goes directly to the point that characterization of this as civil rights damages was material, as her counsel also stated that this was a material term that the entire payment be 1099, to which Starbucks' counsel agreed. So now this change of heart after the November 6th settlement shows that there was clearly not a meeting of the minds that both parties could agree to. And moving ahead, Starbucks also states that, you know, that this issue was a change of heart after Ms. Demese learned that this would have an impact on her workers' compensation claim. This is entirely not true as the impact that this case would have on her workers' compensation claim was material from the onset, from the outset of the litigation. As you can see evidence in the record, after the second settlement conference between the parties, there was a pause in the record so that there can be a discussion with Demese's workers' compensation attorney to determine any settlement agreement in this case, would it have a negative impact on that case. The voluntary resolution. The district court's finding, though, that the refusal stemmed from the after, the post hoc realization that was going to affect her compensation claim. That's a finding of fact, right? Right, and it is my assertion that that finding of fact is where the district court erred. It has to be clearly erroneous. Correct, Your Honor. So it would have to be clearly erroneous, and that is one area that the district court's finding did err because, again, I stated, throughout the entire settlement conferences, the workers' compensation claim was always brought up as a material issue. Any manner in which Demese would either have to voluntarily resign or be terminated would have a significant impact in that concurrent litigation. So asking her to voluntarily resign would prevent that workers' compensation claim from moving forward, as she would not be entitled to any particular employee benefits. Was the tax allocation issue raised before the November 6th mediation? On the record, the tax allocation was not raised prior to the November 6th settlement. If the November 6th mediation, the handshake and everything, is determined to be the contract, then tax allocation wouldn't have been part of it. Well, it was testified by Demese's counsel that it is normal practice that the tax allocation could be one of the very last terms to be discussed, as it was in this particular case. Demese's counsel testified that during their November 6th settlement conversation, tax allocation and having this be issued solely as civil rights damages was a material term, as we stated in the November 4th settlement. But it wasn't discussed with the other side before November 6th? Your Honor, in the record, it states by Demese's counsel in the email that it was discussed, again, in terms of the exact language of the conference itself, the exact transcript of the conference. We do not have any testimony at the evidentiary hearing that it was discussed during that particular settlement conference, no. But even before getting to the tax allocation issue, again, we want to assert that there was no meeting of the minds, because the conduct that happened immediately after the November 6th settlement conference shows that parties were not in agreement on how this agreement should be drafted or characterized initially. So that confusion or that lack of clarity amongst the parties clearly shows that prior to even discussing it. Of course, your opponent says that the nature of the disagreement was sort of a fine-tuning of the details, working out how to achieve the deal that had been struck on November 6th. What's your response to that characterization? My response, Judge Griffith, would be that working out the details, the characterization of that settlement amount is a major detail that should be considered when trying to – The major detail is $73 value, but you're now saying what was really at stake was there was some symbolic – some symbolic value. Was that in your brief, the argument that there was a symbolic value to this as well? I don't recall seeing that. I recall seeing dispute over dollar amounts, but I don't remember the symbolic value argument. Right. And that discussion was in terms of making sure that the settlement agreement amount would be characterized as 1099. It being symbolic was just a part of that particular discussion, that the characterization was important to Demesey and Compton at the time. I don't want to get too nitpicky. Did the word symbolic appear in the brief? No, Your Honor, the word symbolic did not appear in the brief, yes. Again, purely before even getting to the tax allocation discussion, we just must deal – this Court has a chance to deal with the fact that there was no meeting of the minds between the parties. Starbucks' own admission that there was a lack of clarity after the characterization of the settlement amount is demonstrative of that, and I see my time has run. So may I briefly conclude? And for this reason, we ask that this Court reverse and remand this case to the district court. Thank you. Good morning, and may it please the Court. I'd like to focus first with the question Judge Griffith just asked with regard to whether or not there was a symbolic demand from Ms. Demesey regarding whether or not Starbucks would somehow admit or acknowledge that these wages would be allocated for symbolic reasons. That's not reflected in the record, Your Honor. This was a tax allocation issue. In fact, one of the settlement terms was that the settlement was going to be confidential, so there was going to be no admission of liability on either side. So I don't think it's accurate to say that. Speaking of things in the record, is the $73 consequences of the tax in the record? It is, Your Honor. It's on page JA-170. Footnote 3 is the factual finding by the district court that approximately $73 was at stake in this matter. And I think the Court is right to look to focus on what happened on November 6th, as we've discussed, because that's when we allege and the district court found that the agreement was actually reached at the time of that settlement, at the handshake at the settlement. And the district court, in fact, held an evidentiary hearing on that matter, and it held that the parties entered into a binding and enforceable settlement agreement on November 6th, not at some time after, based on two underlying factual findings that this Court reviews for clear error. First, that the parties had agreed on all the material terms, and second, that the parties who were both represented by counsel at that time were intended to be bound by the agreement they reached that day. And the district court found that the facts weigh heavily in favor of Starbuck's position, and that conclusion was correct, as was its conclusion that there was no evidence after the parties shook hands at the November mediation that either party regarded the agreement as incomplete. And, again, we think that's kind of the key factual finding. Are we placing too much emphasis on the shaking of hands? I mean, friendly people shake hands at conclusions of meetings. Of course, Your Honor. But I think it's important to look at that handshake in the context of the entire settlement negotiation. This was not a one-off meeting, casual mediation. This was the fourth. Did anyone besides the magistrate judge's representatives say deal? No. The testimony was that the clerk, law clerk, came back in. But I think this context is important, Your Honor, as well, because what happened actually was that the parties, when they first arrived that day, the clerk, the parties recounted for the clerk all the terms that Starbuck's had insisted on to that date and told him that the outstanding issue was the settlement amount. So the parties went back and forth negotiating those terms, all day long, and then finally, at the conclusion, Starbuck's proposed a number. The law clerk went into the other room to meet with Demacy's counsel. They, all three of them, the clerk, Demacy, and her counsel, returned to the room. And at that time, the clerk said, we have a deal. And everyone shook hands at that point. So at that point, all Starbuck's terms were well known to the parties. They were on the table. The outstanding issue was the money. The parties shook hands on that. And it was only at that point that the parties then discussed the outstanding, we feel essentially administrative matters, taking discovery off the calendar, discussing the tax allocation, discussing how the attorney's fees would get paid out of the settlement. And there was additional, I can't remember what the other thing is as well, but again, it was essentially kind of, oh, yeah, which party would memorialize the settlement terms, and Starbuck's counsel agreed to do that. We think another key finding, Your Honor, is that the district court actually found that the true bone of contention between the parties was not this tax allocation issue, and we think that's important as well. It was actually that, as Ms. Demacy's counsel acknowledged in several briefs below, she had actually learned after the settlement had been reached that resigning would jeopardize her pending workers' compensation claim. And Starbuck's had agreed all along, and it was one of the terms, that it would release, that she would have to release all of her claims except for the workers' compensation claims. There's no dispute that Starbuck's was willing to allow her workers' compensation claim to go forward. It was something she learned afterward, which she had never told Starbuck's, that actually resigning was also going to be problematic for her claim. But again, that was not, she didn't tell Starbuck's about it, and in fact, according to her briefs below, did not even learn of that until after the November 6th mediation. To quickly recap a few pieces of evidence that the district court relied on, in terms of materiality, again, the court focused and said that there was no dispute as to Starbuck's terms, and regarding the tax allocation, again, it was not discussed until after the handshake. It was essentially ministerial, the way the payment was going to be made, and to some extent dictated by federal law. The parties did not have unlimited discretion on this. It was a small amount of money, and again, it was a factual finding on that point. And then finally, that true bone of contention. And the district court acknowledged that in certain circumstances, certainly tax allocation could be a material term, but the question is what these parties deem to be a material term, and the fact that Dempsey and her counsel accepted the settlement amount without ever discussing tax allocation suggested that it was not material here. With regard to intent, the court looked to the entire context. It looked to the fact that there were four mediation sessions. It looked to the fact that prior to the mediation, Dempsey's counsel actually offered to accept all of Starbuck's terms, including voluntary resignation, if they could agree on a settlement amount, which they did at the mediation. The we have a deal, the shake hands, which again, I don't want to place too much emphasis on, but I think it's relevant in terms of the overall context. And the fact that the parties stayed in litigation and began discussing sort of administrative matters after that I think is really crucial. If the court has any further questions, I'd be happy to answer them. Otherwise, we ask that the court affirm and order enforcement of the settlement agreement. Thank you. Thank you very much. Does the plaintiff have any more time? We'll give you another two minutes. Your Honor, just to reiterate, the totality of the circumstances, the district court did not take that into consideration. Now, on the record, it should also be noted that after the email communication following the November 6th settlement amount, counsel for Dempsey stated that they would put depositions back on the table because there was no agreement between the parties as to the manner in which the settlement amount should be characterized. So the email itself, again, as I quote from the email, the basis for their statement in mediation was that a material term be that the entire payment is 1099, to which Starbucks counsel agreed. So this has been material since the outset of, again, litigation. It was not something that came up merely after parties shook hands in the November 6th settlement conference. And also, Starbucks stated in that email in response was, sorry if I was not clear. So for Starbucks stating that, that was their own admission, that this was something that was indeed discussed between the parties prior to any drafting or memorialization of a settlement agreement. This was something that was discussed between the parties, and it was made known to Starbucks that this material term of how this would be characterized was indeed material. And, again, looking to just the totality of the circumstances here, how the settlement agreement would characterize any voluntary resignation terms or any workers' compensation terms was not a change of heart matter. It was something that was important since the beginning of the conference, settlement conferences between counsels. What did you say to the point made by opposing counsel that she didn't learn that resigning would hurt her workers' compensation claim until after the meeting? To your honor, and on the record, again, learning about how it would hurt her, this was something that was material and allowed the parties to take a break so that she can discuss with her workers' compensation. Did it not occur until after the November 7th meeting? She had conversations with her counsel on how to resign, assuming how it was characterized during that November 6th and learning whatever. He says, and I don't have enough of a recollection about the record, that counsel below said that she didn't learn until after the November, I think, 7th meeting. November 6th meeting? November 6th meeting. Again, that would not be factually correct as she was aware because her workers' When you say it wouldn't be factually correct, you mean that the counsel was wrong when counsel said that or that the counsel never said that? That the counsel never said that she learned, that would be factually incorrect because, again, there was conversations with her workers' compensation attorney who was separate from this litigation that any settlement agreement that would be produced after this discussion between counsels cannot have an effect on her workers' compensation claim. So the idea of her voluntary resigning versus termination obviously would have a huge impact on her workers' compensation claim. Thank you, Your Honors. All right. Ms. Jackson, you were appointed by the court as amicus in this case, and we're grateful for your assistance. Thank you.
judges: Garland, Griffith, Edwards